## The Hamilton J. Mills.

## The Walter A. Sherman.

### Fortier v. Five Hundred and Forty-Three Thousand Three Hundred and Twenty-Five Feet of Pine Lumber, late Cargo of the Barge Hamilton J. Mills.

### Same and another v. Five Hundred and Sixty Thousand and Sixty-Two Feet of Pine Lumber, late Cargo of the Barge Walter A. Sherman.

*(District Court, N. D. New York. January, 1885.)*

Demurrage — Contract — "Good Dispatch" — Waiver of Demurrage — Evidence — Dismissal of Libel.
    Upon examination of the evidence and the circumstances in this case, *held*, (1) that an agreement binding upon respondent to give good dispatch is not proven; and (2) that it is shown that the libelants waived their claim for demurrage, and the libel should be dismissed.

These are demurrage cases.

On the twenty-fifth day of October, 1883, the libelants, as owners of the barges Mills and Sherman made a contract through Warner & Becker, ship-brokers, of Cleveland, Ohio, the special agents of Mary

J. Poole, the respondent, to convey a quantity of lumber from Penetanguishene, on Georgian bay, Ontario, to Buffalo, New York. The only authority given Warner & Becker is found in letters and telegrams from S. G. Poole, the respondent's general agent at Buffalo. The statements and representations made by Poole during this correspondence, between October 2d and October 25th, so far as it is necessary to refer to them, were as follows:

He stated that there were 2,000,000 feet of lumber in good condition *at* the dock (not *on* the dock, as libelants erroneously assumed, but on or near the dock) of the Brentwood Lumber Company, at Penetanguishene, ready to deliver on the vessel's rail; that he would pay $3.25, but not $4, per thousand feet. On the twenty-fifth of October he received from Warner & Becker the following telegram:

"If we can charter two million capacity, to leave here Saturday, for your lumber, at $3.50, shall we do so?"

The reply was:

"If cannot for less, will pay $3.50, loading as fast as possible."

On the same day, Warner & Becker gave the libelants the following order:

"CLEVELAND, OHIO, October 25, 1883.

"*Brentwood Lumber Company, Penetanguishene, Ontario*—GENTLEMEN: You will please deliver on rail of barges Hamilton J. Mills, Sherman, and S. D. Hungerford, cargoes of lumber, and consign same to Buffalo, N. Y. Lake freight, three dollars and fifty cents ($3.50) per thousand, to be delivered on rail of barges and taken from rail at Buffalo, N. Y. Barges to have good dispatch in loading.         Yours truly,         WARNER & BECKER.
"By order of S. G. POOLE, General Agent."

The barges left Cleveland October 27th, and reached Penetanguishene November 4th. They commenced loading Monday, November 5th. In order to expedite the loading, the mills were closed down and the mill hands worked several nights until 12 and 1 o'clock. The Sherman, carrying 651,060 feet, finished loading on the twenty-seventh of November; the Mills, 650,000 feet, on the 20th; the Hungerford, 340,000 feet, on the 22d. The tow started for Buffalo on the 23d, reaching there on the fourth of December. On the twenty-ninth of October the libelant Fortier and his agent, Rice, had an interview with Poole, at the latter's office in Buffalo. A copy of Warner & Becker's order, containing the clause for "good dispatch," was then exhibited to Poole, and he, in return, showed Fortier the entire correspondence with Warner & Becker. Poole there stated that Warner & Becker were mistaken in saying that there were 2,000,000 feet of lumber on the dock at Penetanguishene; that there were not to exceed 500,000 feet; that the remaining lumber could be run down on a tram-way at the rate of 100,000 feet per day, and that it would take a number of days to complete the loading. On the 30th, Poole telegraphed the lumber company not to load unless the barges would load without demurrage. On the same day, Rice, as Fortier's repre-

sentative, went to Penetanguishene to examine the facilities for loading, and on the 31st advised Fortier by telegram of the general situation, stating that it would take 16 or 18 days to load. He also advised Fortier of Poole's telegram to the lumber company not to load if there was any claim for demurrage. In reply, Fortier telegraphed Rice to present order for cargoes on arrival of the barges, and if the lumber company refused to load, to notify him and he would send further instructions. Meanwhile Rice, and Crossfield, the representative of the lumber company, had attempted to negotiate upon the question of demurrage. As a result of this conversation, Crossfield, on the 31st, telegraphed Poole as follows:

"You must settle question of demurrage with Mr. Fortier, owner of barges. Telegraph whether to load."

On the first of November Poole answered in these words:

"Fortier says no demurrage, but load as fast as possible."

This telegram was accepted by Rice and the lumber company as final, and the loading commenced as soon as the barges were ready. Poole testifies that this telegram was sent with Fortier's approval and assent. Fortier denies this. Damages are demanded for the delay in loading, not for fraudulent representations.

*Benjamin H. Williams,* for libelants.

*George Clinton,* for respondent.

Coxe, J. Of the issues involved in these actions but two will be examined: *First.* Was there an agreement binding upon the respondent to give good dispatch? *Second.* Did the libelants waive their claim for demurrage?

Whether or not there was a valid agreement for good dispatch depends entirely upon the authority delegated to Warner & Becker. Their instructions were wholly in writing, and nowhere contained permission to insert such a clause. The nearest approach to it is found in the stipulation to load as fast as possible, but this language precludes the idea that the respondent intended to limit herself to any given number of days. Fairly construed, in view of preceding statements, it meant simply that every facility which the dock to which the barges were consigned, and the premises adjacent thereto, afforded, would be used in loading. For so much the brokers were authorized to contract, but surely no inference can be drawn from the language used which justified the insertion of a clause, which, if the libelants' contention, is correct, bound the respondent to accomplish the absolute impossibility of loading in from two to four days. There was nothing in the correspondence and nothing in the general character of the brokers' employment to warrant it. They were the particular agents of the respondent to make this single agreement. Their authority was specific and should have been strictly pursued. Having exceeded it, the principal is not bound. Nor can it be said that the contract, as interpreted by the libelants, was, by any act of omis-

sion or commission, subsequently ratified. Poole knew nothing of the stipulation for good dispatch until shown the order by Fortier, four days after it was given. He then, if his own statement is to be believed, distinctly repudiated it. But upon the uncontradicted testimony there was no ratification. Warned by a similar experience a short time previous, Poole endeavored, from the inception to the end of the negotiations, to avoid all claims for demurrage. He knew that by no human power could the barges be loaded in four days at the Brentwood dock. At the interview with Fortier and Rice, on the 29th, the entire correspondence with Warner & Becker was produced, and facts stated which proved to a demonstration that such rapid loading was entirely out of the question. The next day, in order that all doubt regarding his position might be removed, he telegraphed not to load if demurrage was demanded. In view of all this, to say that Poole consented to a construction which rendered his principal liable in damages if she failed to accomplish an impossibility is to reflect seriously upon his sanity. That the respondent fairly performed the contract thus limited and defined, is, it is thought, sufficiently established by the proof. Indeed, it is not seriously disputed that the loading progressed as rapidly as the situation at the Brentwood dock permitted.

*Second.* Did the libelants waive their claim for demurrage? On the first of November Poole sent to the agent of the Brentwood Lumber Company the following dispatch: "Fortier says no demurrage, but load as fast as possible." The respondent contends that this telegram was duly authorized by Fortier. The libelants insist that it contains a false statement, and was without Fortier's knowledge or consent. What is the proof? Poole testifies that on November 1st, at his office, he showed Fortier Crossfield's dispatch of the day previous, in which he says that the question of demurrage must be settled at Buffalo; that after reading it Fortier replied, substantially, that he should not demand demurrage, but vessels must be loaded as fast as possible; that the dispatch in question was then written, and after being shown to Fortier, was sent with his full knowledge and approbation. Poole is partially corroborated by the clerk in his office, who recollects seeing a dispatch handed to Fortier on that day. He also remembers that after Fortier had given his consent, a messenger was called and the dispatch delivered to him. Fortier denies that such a conversation or transaction took place at any time. He thinks, however, that he was at Poole's office and had an interview on November 1st, but he does not give the particulars of the conversation. He says that on the previous evening, having in his hands Rice's dispatch advising him of Poole's direction not to load unless demurrage was waived, he stepped into Poole's office and told him that the vessels had not arrived; that there was no person at Penetanguishene authorized to demand demurrage, and that he wanted Poole to load according to order. That this was a most extraordinary, irrational and incon-

sequential statement, unless it bore upon the question in dispute, which had been referred to them for settlement by Crossfield's telegram, will hardly be denied. When asked if the telegram waiving demurrage was shown him, Fortier, without saying positively that it was not, evidently desires to leave that impression, for he testified that, although a telegram was shown him, it had reference to an entirely different matter. This alleged telegram was not produced or satisfactorily accounted for in any way. Poole denies that he showed Fortier any telegram but the one waiving demurrage.

It will be observed that Poole's evidence is positive and affirmative, Fortier's negative and indirect. But, disregarding the disputed testimony, what are the presumptions to be drawn from the admitted facts? What are the probabilities? In order to answer these questions intelligently, it is necessary to understand the situation and the surroundings of the parties. Fortier knew that Poole disputed his interpretation of the order for good dispatch, and insisted that the brokers had no authority to insert that clause; he knew that Poole contended that he was only required to load as fast as possible at the Brentwood dock. He knew that Poole had telegraphed his people at Penetanguishene not to load unless all claims for demurrage were abandoned; that Rice and Crossfield had refused to settle the question of demurrage; that unless it was settled he must abandon all expectation of procuring a cargo upon this order. His vessels had then passed Port Huron, and had entered the open lake. There was no way to recall them or direct them to another port. The season was growing late, and it can hardly be supposed that Fortier overlooked the fact that even with good dispatch, as he interpreted the order, his barges could not, in all probability, be released before November 24th or 25th; so near the close of navigation, that even if another commission could be obtained it would be hazardous to undertake it. The alternative thus offered Fortier was either to load without demurrage, or refuse to do so and lose his freight. With his barges at an obscure and distant port, the opportunity for further employment during the season was by no means certain. Was it wise for him to abandon a certainty for a doubtful and disputed claim which could only be realized upon, if at all, at the end of a protracted litigation? Is it not reasonable to suppose that in these circumstances, even though he felt himself aggrieved, he concluded to accept the lesser of two evils which confronted him? It is incredible that this barrier of demurrage, which was regarded as insurmountable by Poole, could have been removed without some notice being taken of it by those most interested; that his apparently unconditional surrender should have taken place without even a murmur of comment or inquiry. And yet, if the libelants' theory is correct, the subject was never alluded to, though the parties met in consultation after the question had assumed this serious shape. Is this position reasonable? To maintain it evidence must be rejected, probability disre-

garded, and Poole found guilty of a most atrocious piece of chicanery. He must be convicted of a fraud, alike infamous and transparent; a trick which could not have remained long undiscovered, and which would brand him not only as a scoundrel, but also as a simpleton. There is nothing in the proof to warrant such a conclusion. The weight of evidence and the presumptions are with the respondent upon this issue. It follows that the libels must be dismissed, with costs.